1
2
3
4        **UNITED STATES DISTRICT COURT**
5        **DISTRICT OF NEVADA**
6
7    ELIZABETH A. CUTTITTA,                          )
8                        Plaintiff,                  )    Case No.  2:12-cv-02184-APG-GWF
                                                     )
9    vs.                                             )    **FINDINGS AND**
                                                     )    **RECOMMENDATION**
10   CAROYN W. COLVIN, Acting Commissioner,          )
     Social Security Administration,                 )
11                                                   )
12                        Defendant.                 )
     _____       )
13          This matter is before the Court on Plaintiff Elizabeth Cuttitta's Complaint for Review of

14   Final Decision of the Commissioner of Social Security (#1), filed on December 21, 2012 which

15   denied her application of social security disability benefits.  The Acting Commissioner filed her

16   Answer (#16) on April 25, 2013.  Plaintiff filed her Motion for Reversal and Remand (#16) on May

17   28, 2013.  The Acting Commissioner filed her Cross-Motion to Affirm and Opposition to

18   Plaintiff's Motion for Reversal (#18) on June 27, 2013.  Plaintiff filed her Reply (#19) on July 17,

19   2013.

20                                          **BACKGROUND**

21          **A.        Procedural History.**

22          Plaintiff filed an application for a period of disability, disability insurance benefits and

23   supplemental social security income on August 27, 2009, alleging that she became disabled on June

24   1, 2009.  AR 126-129; 130-136.  The agency denied Plaintiff's application initially on January 5,

25   2010, and upon reconsideration on August 18, 2010.  AR 78-82; 84-89.  Plaintiff requested a

26   hearing before an Administrative Law Judge (ALJ).  AR 92-93.  The hearing was conducted on

27   June 9, 2011 and Plaintiff appeared and testified.  AR 51-73.  The ALJ issued his decision on June

28   17, 2011 and concluded that Plaintiff was not disabled from June 1, 2009 through the date of the

1  decision. AR 30-36. Plaintiff's request for review by the Appeals Council was denied on

2  September 28, 2012. AR 6-11. Plaintiff then commenced this action for judicial review pursuant

3  to 42 U.S.C. § 405(g). This matter has been referred to the undersigned magistrate judge for a

4  report of findings and recommendations pursuant to 28 U.S.C. §§ 636 (b)(1)(B) and (C).

5        **B.**     **Factual Background.**

6            **1.**     **Plaintiff's Hearing Testimony and Written Reports.**

7      Plaintiff Elizabeth Cuttitta alleges that she is disabled as a result of depression and bipolar

8  disorder. Ms. Cuttitta was born on September 28, 1964 and was 47 years old at the time of the

9  hearing before the ALJ. AR 54. She is married and, on the date of hearing, resided with her

10  husband and three children, ages 11, 12 and 14. AR 59. Ms. Cuttitta attended school until the

11  eleventh grade when she quit to care for her seven brothers and sister. She does not have a general

12  education diploma (GED). AR 56. Her past work has primarily been as a housekeeper/maid. AR

13  55. She was employed as a housekeeper at the Palace Station Hotel & Casino from June 2006 to

14  June 11, 2009. Prior to that, she worked as a housekeeper at Circus Circus Hotel & Casino from

15  April 1998 until August 20, 2002. AR 183. She also told Dr. Steven Goldstein that she worked for

16  two years as a housekeeper at the Flamingo Hilton Hotel. AR 214.

17      Ms. Cuttitta was terminated from her job at the Palace Station on June 11, 2009. She

18  testified that she had a problem with her supervisor that resulted in her termination. She did not

19  have problems with her co-workers. AR 55-56. Ms. Cuttitta stated that she sought other work after

20  her termination, including putting in an application with the county. AR 56. She testified that the

21  termination caused her mental depression to worsen. She stated: "I kind of, I'd say, meltdown, I

22  frozed up. Just -- Everything just stopped on me." AR 56. When asked to explain why she cannot

23  return to employment, Ms. Cuttitta testified:

24          Your Honor, with my condition, depression, I can't focus. I can't
        even concentrate, not even to perform the duties that I have to do. I

25          am -- I guess I'm paranoid. At night, I'm at home, I'm constantly
        checking the door and locking, even lock the gate. Constantly I hear

26          noises, maybe it's a bump in the night. I get up. I don't sleep. Three
        hours of sleep is all I do. I get up constantly, getting up and looking

27          around, checking on the kids to make sure they're okay.

28     AR 57.

1   Ms. Cuttitta testified that her doctor, Kristy Muir, prescribed Risperidone to her which

2 calmed her down and allowed her to get some more rest.  However, she still only gets four hours of

3 sleep a night.  AR 58.  Ms. Cuttitta repeated that she is "paranoid" and suffers from "bad

4 depression."  She also has problems maintaining concentration.  She indicated that she starts tasks

5 such as washing, but gets distracted and is not able to finish.  AR 58-59.

6   Ms. Cuttitta completed Social Security Administration Function Reports on October 13,

7 2009 and March 27, 2010 in which she answered questions about her daily activities and abilities.

8 AR 149-156; 166-173.  In the first report, Ms. Cuttitta stated that she gets up at 6:30 a.m.  She

9 takes her children to school.  She has some difficulty doing this because she forgets where she puts

10 things, such as her keys or shoes.  After returning home, she tries cleaning and washing clothes.

11 She tries to sleep at noon because she is tired.  AR 149.  Ms. Cuttitta stated that she cares for her

12 children by cooking, washing and pressing their clothes, and fixing their hair.  Her husband helped

13 with the cooking and housework, but not outside work or laundry.  AR 150.

14   Ms. Cuttitta stated that her depression made her forgetful and affected her ability to sleep

15 because of worrying.  AR 150.  She reported no problem with her personal care such as dressing,

16 bathing or hair care.  Id.  She did not need reminders to take medication.  AR 151.  Ms. Cuttitta

17 cooked meals from frozen food to a complete meal, but indicated that her cooking is affected by her

18 forgetfulness.  Id.  She goes outside to hang clothes and feed the dog.  She shops for food and shops

19 at Wal-Mart for bargains.  She also shops for clothes at second hand stores.  She indicated that she

20 is able to pay bills, count change and use a checkbook or money order.  Her husband handles the

21 family bank account(s).  AR 152.

22   Ms. Cuttitta watches soap operas and does knitting.  She does not engage in outside social

23 activities.   AR 153.  She did not have problems getting along with family, friends or neighbors, but

24 stated that she keeps to herself.  AR 154.  She indicated that she can pay attention "for a while" and

25 that she is "okay" at following written instructions.  She gets along with authority figures when

26 they are good people.  She denied ever being fired from a job because of difficulties in getting

27 along with people.  AR 155.  Ms. Cuttitta stated that she tries to handle stress by counting to 10,

28 walking away or pretending not to be there.   Handling changes in routine is difficult, but she gets

1  used to it.  In regard to whether she has noticed any unusual behavior or fears, she reported that she

2  keeps to herself and tries to cope with it.  Id.  Under "Remarks," Ms. Cuttitta stated that she had

3  been unbalanced since she lost her job at Palace Station and was having problems with her

4  memory, stress and worry.  She stated that the only thing that kept her going was her family.  AR

5  156.

6       The information that Ms. Cuttitta provided in the March 27, 2010 report was consistent

7  with her October 13, 2009 report.  AR 166-173.  Ms. Cuttitta's hearing testimony was also

8  generally consistent with her two written Function Reports.  She testified that when she goes

9  shopping, however, she usually goes with her mother or one of her children who assist in the

10  shopping.  AR 59.  Ms. Cuttitta also gave somewhat confusing testimony regarding the extent to

11  which she cooks meals for herself and her family.  The gist of her testimony appeared to be that she

12  can prepare sandwiches or a salad, but does not otherwise prepare meals.  AR 60.

13       **2.    <u>Medical Records and Opinions.</u>**

14       **(a) Harmony Healthcare:**  Mental health treatment records for Ms. Cuttitta were obtained

15  from Harmony Healthcare for the period from October 8 to 16, 2008.  AR 187-192.  The October

16  8, 2008 progress note indicates that Ms. Cuttitta was seen for a "work mandate."  She reported

17  having suicidal thoughts but no intent.  Ms. Cuttitta stated that she was under the impression she

18  was getting a release to work slip and was upset that she was not "explained to."  AR 192.

19       A two page Psychiatric Evaluation was prepared on October 13, 2008.  AR 190-191.  Under

20  reason for evaluation/chief complaint, Ms. Cuttitta reported "They harass me at work."  She

21  indicated that she was put under pressure at work.  Id.  The mental status examination appeared to

22  be normal.  AR 190.  Under Axis I of the Diagnosis, the psychiatrist stated "adjustment disorder

23  with depression--work."  There was no prescription for medication.  She was recommended to have

24  counseling.  Id.  A document entitled "Treatment Plan," dated October 14, 2008, listed Ms.

25  Cuttitta's current symptom as difficulty with work on a daily basis and that she was having a hard

26  time with a supervisor.  The treatment plan stated that Ms. Cuttitta had a current GAF (global

27  assessment of functioning) score of 61, with a highest GAF of 70.  AR 189.  Ms. Cuttitta was

28  recommended to undergo counseling for six visits, at one visit per week.  Id.

4

Dr. Marian Orr, D.O. prepared a Psychiatric Follow-up Report on October 16, 2008 which stated that Ms. Cuttitta was doing well and sleeping as much as possible. AR 188. Under objective examination, Dr. Orr reported that Ms. Cuttitta was oriented times four, was pleasant, cooperative, had appropriate eye contact, her mood was euthymic (normal), her affect was congruent, her thoughts were rational and there was no evidence of paranoia or confusion. Ms. Cuttitta was given a slip to return to work and was recommended for counseling/continued group. AR 188. There is no record that Ms. Cuttitta continued with counseling after October 16, 2008 and before she was terminated from her job on June 11, 2009.

**(b) Dr. Steven Goldstein:** Dr. Steven Goldstein, psychologist, conducted an "Extended Mental Status Examination (EMSE)" of Ms. Cuttitta on July 29, 2010 at the request of the Bureau of Disability Adjudication. AR 211-218. Dr. Goldstein noted that he was provided with the Function Reports that Ms. Cuttitta completed on October 13, 2009 and March 27, 2010, and the records from Harmony Healthcare for the period from October 8-16, 2008. AR 211. Ms. Cuttitta reported to Dr. Goldstein that she was over-stressed, frustrated, mad at her husband, forgetful, and that she gets emotional and loses it. AR 212. She initially stated that her symptoms began one and one-half years previously, but corrected her statement and said that the symptoms began three years ago. Id. Ms. Cuttitta stated that she had never received mental health treatment. AR 212-213. She stated that the termination of her job at the Palace Station was the major event that caused her problems. AR 213-214.

Under "Mental Status Examination," Dr. Goldstein noted that Ms. Cuttitta's facial expressions were mainly blank. Her motoring function appeared within normal limits. Her reaction to Dr. Goldstein was "one of surface cooperation . . . with no specific mannerisms." Her speech inflection, pitch and loudness was within broad average limits. She had very poor speech pronunciation, with use of incorrect words and grammatical problems present. Her response continuity appeared to be within average limits. Response latency was mainly within average limits, but was sometimes impulsive. Her speech organization was mainly coherent, logical and relevant. AR 214. Ms. Cuttitta rated her depression over the preceding month as an eight on a scale of one to ten. Her affect was mainly flat. In regard to suicidal thoughts, she stated that her

husband should collect the life insurance.  She reported that she took a bunch of diet pills in an apparent suicide attempt seven years previously.  Dr. Goldstein noted that Ms. Cuttitta gave several exaggerated responses, became somewhat hysterical in nature and cried a good deal.  AR 214-215.

Under "Thought Content," Dr. Goldstein stated that Ms. Cuttitta did not display compulsions, obsessions, ruminations, indecision, phobias, free-floating anxiety, dread, loss of identity, feeling empty, depersonalization, paranoid delusions, ideas of persecution, influence, reference, thought insertion, and thought broadcasting.  Somatic preoccupation may have been present.  Ms. Cuttitta's orientation to time, date, place, person and general reason for the examination appeared adequate.  Her alertness was also adequate.  AR 215.

Under "Cognitive Function," Dr. Goldstein noted that Ms. Cuttitta was able to remember one of two trials of 4 digits forward, but failed on both trials of 5 digits forward.  She was able to remember both trials of 3 digits backwards, but failed on trials of 4 digits backwards.  Ms. Cuttitta responded "I don't know" when she was asked to do serial 7s or serial 3s.  She performed the simple math problems "12 plus 11" and "9 times 5" correctly, but  incorrectly calculated "12 times 11."  Dr. Goldstein stated:  "During alphanumeric counting, this was accomplished by this claimant until L-12, where I stopped her.  Overall, this seemed to be in the MR range of abilities." AR 215.  He also found that her general knowledge was in the MR range of abilities.  Her delayed memory was in the low average range of abilities.  Her word knowledge was in the MR range of abilities.  Her abstract thinking was in the MR range for identifying similarities and for comprehension.  AR 215-216.

Dr. Goldstein also questioned Ms. Cuttitta about her daily activities.  She reported that she took care of her personal hygiene.  Her sleep patterns were terrible.  She stated that she cooked, did household cleaning, and went shopping.  She read books, watched soap operas and played with her kids.  Ms. Cuttitta stated that she has no friends or contact with extended family.  She did not attend religious activities, clubs or meetings.  She drove an automobile.  AR 216-217.

Under "Functional Assessment," Dr. Goldstein stated that "[o]n a sustained basis her overall responses may indicate she is able to understand, remember, and carry out one to two step instructions."  He also stated that Ms. Cuttitta might be able to interact appropriately with the

1  public, co-workers or supervisors.  He also stated that on a sustained basis she might be able to

2  maintain concentration and attention sufficiently to carry out one to two step instructions.  AR 217.

3        Dr. Goldstein's diagnostic impression under Axis I was "R/O [rule out] Malingering" and

4  "R/O adjustment disorder with depressed mood deferred."  Under Axis IV, he stated that Ms.

5  Cuttitta had problems with primary relationships -- no contact with family and problems with social

6  relationships, inadequate friendships, and economic problems- inadequate finances.  Under Axis V,

7  Dr. Goldstein stated that Plaintiff had a current GAF score of 57 and a highest GAF score during

8  the past year of 57.  Under "Prognosis, Dr. Goldstein stated that Ms. Cuttitta's psychological

9  prognosis was unknown and recommended that she "be retested with a WAIS-IV and TOMM to

10  confirm these diagnoses."  AR 217-218.

11        **(c) Dr. Mark Evans:**  On August 16, 2010, Dr. H. Mark Evans, Ph.D. performed a residual

12  functional assessment based on a review of Ms. Cuttitta's records.  AR 219-236.  Dr. Evans found

13  that Ms. Cuttitta had mild restriction of the activities of daily living, mild difficulties in maintaining

14  social functioning, and moderate difficulties in maintaining concentration, persistence or pace.  AR

15  229.  She had no episodes of decompensation.  Id.  The evidence did not establish the presence of

16  "C" criteria.  AR 230.  Dr. Evans further found that Ms. Cuttitta was not significantly limited in the

17  ability to: (1)  remember locations and work-like procedures, (2) understand and remember very

18  short and simple instructions, (3) carry out very short and simple instructions, (4) maintain

19  attention and concentration for extended periods, (5) perform activities within a schedule, maintain

20  regular attendance, and be punctual within customary tolerances, (6) sustain ordinary routine

21  without special supervision, (7) work in coordination or proximity to others without being

22  distracted and (8) make simple work-related decisions.  AR 233.  He also found that her ability to

23  engage in sustained concentration and persistence, and social interaction and adaption, were not

24  significantly impaired.  AR 234.  Dr. Evans concluded that Ms. Cuttitta appeared to have the ability

25  to carry out simple job instructions.  AR 235.

26        **(d) Kristy Muir:**  Ms. Cuttitta's counsel submitted a "Mental Health Physician

27  Questionnaire" completed by Kristy Muir on September 13, 2010.  AR 240.  Although the

28  questionnaire identifies Kristy Muir as "Dr. Kristy Muir," she is reportedly a nurse practitioner.

1   Under Axis I, Ms. Muir diagnosed "Bi-polar depression with psychosis."   The patient's signs or

2   symptoms were reported as "hears voices, paranoid ideation, tangential speech, OCD, ideas of

3   reference, mood swings, [unintelligible] insomnia.  The listed medication was Risperdal (sic) 1mg.

4   The side effect of this medication was listed as decreased concentration and the prognosis was

5   reported as "poor."   Ms. Muir did not list a current GAF score for the Plaintiff, but stated that her

6   highest GAF for the past year was 42.  Ms. Muir did not provide information regarding the

7   frequency or length of her contact with Ms. Cuttitta.  AR 240.  Ms. Cuttitta identified examination

8   or treatment appointments with Ms. Muir beginning in September 2010 and continuing through

9   March 2011. *Motion for Reversal (#16), pg. 7,* citing AR 181.  However, no examination or

10  treatment records for these appointments were submitted by Plaintiff prior to the hearing before the

11  ALJ or as a supplement to Plaintiff's appeal to the Appeals Council.

12              **C.      Administrative Law Judge's June 27, 2011 Decision.**

13          The ALJ applied the five-step sequential evaluation process established by the Social

14  Security Administration in determining whether Plaintiff was disabled.  At the first step, the ALJ

15  found that Plaintiff had not engaged in substantial gainful activity ("SGA") since June 1, 2009.  AR

16  32.  Second, he found that Plaintiff had the following severe mental impairment:  bipolar disorder

17  NOS [not otherwise specified].   Third, the ALJ found that Plaintiff did not have an impairment or

18  combination of impairments that meets or medically equals one of the listed impairments in 20

19  CFR Part 404, Subpart P, Appendix 1, Listing 12.04.  (20 CFR 404.1520(d), 404.1525, 404.1526,

20  416.920(d), 416.925 and 416.926).  AR 32.

21          In finding that Ms. Cuttitta's mental impairment did not meet or medically equal the criteria

22  of listing 12.04, the ALJ stated that he considered whether the "paragraph B" criteria were satisfied.

23  Under this criteria, the mental impairment must result in at least two of the following: marked

24  restriction of activities of daily living; marked difficulties in maintaining social functioning;

25  marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of

26  decompensation, each of extended duration.  The ALJ noted that a marked limitation means more

27  than moderate, but less than extreme.  Repeated episodes of decompensation, each of extended

28  duration, means three episodes within one year, or an average of one every four months, each

8

1    lasting for at least two weeks.  The ALJ found that Ms. Cuttitta had only mild difficulties in

2    activities of daily living and social functioning, moderate difficulties in concentration, persistence

3    or pace, and no episodes of decompensation for an extended period.  The ALJ also found no

4    medical evidence to establish the presence of "paragraph C" criteria.  AR 32.

5         At the fourth step, the ALJ found that Ms. Cuttitta had the residual functional capacity to

6    perform a full range of work at all exertional levels, with the following non-exertional limitations:

7    She can understand, remember, and carry out one to two step instructions, typical of the world of

8    unskilled work.  He found that Ms. Cuttitta can adequately interact with co-workers, the public, and

9    supervisors.  She can sustain the concentration necessary to perform work tasks at the specific

10   vocational preparation (svp) levels of one and two.  AR 33.

11        In determining Ms. Cuttitta's residual functional capacity, the ALJ accorded great weight to

12   the opinion of the examining physician Dr. Steven Goldstein that "the claimant was able to

13   understand, remember, and carry out one to two step instructions despite her adjustment disorder

14   diagnosis."  AR 34.  The ALJ also noted  Dr. Goldstein's findings that Ms. Cuttitta may be able to

15   adequately interact with co-workers, the public and supervisors, and that she "could likely sustain

16   the concentration necessary to complete work tasks, as well."  AR 34.  The ALJ further noted that

17   Dr. Goldstein recommended that Ms. Cuttitta be re-tested with the Wechsler Adult Intelligence

18   Scale, Fourth Edition (WAIS-IV) and the Test of Memory Malingering (TOMM) because he

19   suspected malingering and doubtful validity in her cognitive task performance.  AR 34.  While

20   noting Dr. Goldstein's findings that Ms. Cuttitta's fund of knowledge fell into the mentally retarded

21   range and her delayed memory was in the low-average range of ability, the ALJ stated that the Ms.

22   Cuttitta did not submit any school records to confirm an IQ in the mentally retarded range.  The

23   ALJ also found that "her ability to complete an eleventh grade, formal education, also disputes any

24   finding of general intelligence, within the mentally retarded range."  AR 33.

25        The ALJ stated that Dr. Goldstein's opinion was supported by the claimant's exaggerations,

26   observed during the psychiatric examination.  The ALJ noted that several other physicians

27   reviewed the medical record and collectively concluded that Ms. Cuttitta was not precluded from

28   work.  AR 34.  The ALJ also stated that if Plaintiff's impairments were as severe as alleged, she

1  would have received more invasive treatment modalities to resolve them.  The ALJ found that Dr.

2  Goldstein's opinion was supported by the very limited treatment record.  Ms. Cuttita merely

3  treated with medications management, with a one-month follow-up schedule which signified

4  routine conservative care.  AR 34.  The ALJ noted that the findings of the reviewing psychologists

5  regarding Plaintiff's residual functional capacity were consistent with Dr. Goldstein's opinion.  The

6  ALJ also accorded significant weight to their opinions.  AR 34-35.

7  　　　　The ALJ also drew a strong adverse inference against a finding of disability based on the

8  lack of support for Ms. Cuttitta's application from her treating health care providers.  AR 35.  The

9  ALJ accorded greater weight to the findings and opinions of Dr. Marian Orr in October 2008 than

10  to the opinion of Ms. Muir in September 2010.  The ALJ noted that Ms. Muir stated that Plaintiff

11  had a global assessment of function (GAF) of 42, whereas she had a GAF of 60 on October 13,

12  2008.[1]  The ALJ stated that Ms. Muir "failed to supply even one treating note that could

13  substantiate her global assessment of function findings."  AR 35.  The ALJ further stated that there

14  was not any medical source statement that contradicted his finding regarding Ms. Cuttitta's residual

15  functional capacity.  No treating, examining, or reviewing physician had stated that Plaintiff cannot

16  work, with the restrictions that the ALJ noted in his decision.  AR 36.  The ALJ therefore

17  concluded that Ms. Cuttitta is capable of performing her past relevant work as a maid which is

18  categorized in the Dictionary of Occupational Titles (DOT), job number 323.687-014, as light,

19  unskilled work at the specific vocation preparation (svp) of two.  This work did not require Ms.

20  Cuttitta to perform activities precluded by her residual functional capacity.  AR 36.

21  **DISCUSSION**

22  **I.　　Standard of Review**

23  　　　　A federal court's review of an ALJ's decision is limited to determining only (1) whether the

24  ALJ's findings were supported by substantial evidence and (2) whether the ALJ applied the proper

25  legal standards.  *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996); *Delorme v. Sullivan,* 924

26  

27  _____

28  　　　　[1]Although not specifically mentioned by the ALJ, Dr. Goldstein gave Plaintiff a GAF of 57
on July 29, 2010.

10

1   F.2d 841, 846 (9th Cir. 1991).  The Ninth Circuit has defined substantial evidence as "more than a

2   mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind

3   might accept as adequate to support a conclusion."  *Woish v. Apfel*, 2000 WL 1175584 (N.D. Cal.

4   2000) (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)); *see also Lewis v. Apfel*,

5   236 F.3d 503 (9th Cir. 2001).  The Court must look to the record as a whole and consider both

6   adverse and supporting evidence.  *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993).  Where the

7   factual findings of the Commissioner of Social Security are supported by substantial evidence, the

8   District Court must accept them as conclusive.  42 U.S.C. § 405(g).  Hence, where the evidence

9   may be open to more than one rational interpretation, the Court is required to uphold the decision.

10  *Moore v. Apfel*, 216 F.3d 864, 871 (9th Cir. 2000) (*quoting Gallant v. Heckler*, 753 F.2d 1450,

11  1453 (9th Cir. 1984)).  *See also Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).  The court

12  may not substitute its judgment for that of the ALJ if the evidence can reasonably support reversal

13  or affirmation of the ALJ's decision.  *Flaten v. Sec'y of Health and Human Serv.*, 44 F.3d 1453,

14  1457 (9th Cir. 1995).

15        It is incumbent on the ALJ to make specific findings so that the court need not speculate as

16  to the findings.  *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981), citing *Baerga v.

17  Richardson*, 500 F.2d 309 (3rd Cir. 1974).  In order to enable the court to properly determine

18  whether the Commissioner's decision is supported by substantial evidence, the ALJ's findings

19  "should be as comprehensive and analytical as feasible and, where appropriate, should include a

20  statement of subordinate factual foundations on which the ultimate factual conclusions are based."

21  *Lewin*, 654 F.2d at 635.

22        In reviewing the administrative decision, the District Court has the power to enter "a

23  judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security,

24  with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  In the alternative, the

25  District Court "may at any time order additional evidence to be taken before the Commissioner of

26  Social Security, but only upon a showing that there is new evidence which is material and that there

27  is good cause for the failure to incorporate such evidence into the record in a prior proceeding."  *Id.*

28  . . .

11

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## II.     Disability Evaluation Process

To qualify for disability benefits under the Social Security Act, a claimant must show that: (a) he/she suffers from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less that twelve months; and (b) the impairment renders the claimant incapable of performing the work that the claimant previously performed and incapable of performing any other substantial gainful employment that exists in the national economy. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999); *see also* 42 U.S.C. § 423(d)(2)(A).  The claimant has the initial burden of proving disability.  *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir 1995), *cert. denied*, 517 U.S. 1122 (1996). If the claimant establishes an inability to perform his or her prior work, the burden shifts to the Commissioner to show that the claimant can perform a significant number of other jobs that exist in the national economy.  *Hoopai v. Astrue*, 499 F.3d 1071, 1074-75 (9th Cir. 2007).

Social Security disability claims are evaluated under a five-step sequential evaluation procedure.  *See* 20 C.F.R. § 404.1520(a)-(f).  *Osenbrock v. Apfel*, 240 F.3d 1157, 1162 (9th Cir. 2001).  The claimant carries the burden with respect to steps one through four.  *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).  If a claimant is found to be disabled, or not disabled, at any point during the process, then no further assessment is necessary.  20 C.F.R. § 404.1520(a).  Under the first step, the Secretary determines whether a claimant is currently engaged in substantial gainful activity.  *Id.* § 416.920(b).  If so, the claimant is not considered disabled.  *Id.* § 404.1520(b). Second, the Secretary determines whether the claimant's impairment is severe.  *Id.* § 416.920(c).  If the impairment is not severe, the claimant is not considered disabled.  *Id*. § 404.152(c).  Third, the claimant's impairment is compared to the "List of Impairments" found at 20 C.F.R. § 404, Subpt. P, App. 1.  The claimant will be found disabled if the claimant's impairment meets or equals a listed impairment.  *Id.* § 404.1520(d).  If a listed impairment is not met or equaled, the fourth inquiry is whether the claimant can perform past relevant work.  *Id*. § 416.920(e).  If the claimant can engage in past relevant work, then no disability exists.  *Id.* § 404.1520(e).  If the claimant cannot perform past relevant work, the Secretary has the burden of proof at the fifth and final step to demonstrate that the claimant is able to perform other kinds of work.  *Id.* § 404.1520(f).  If the

1   Secretary cannot meet his or her burden, the claimant is entitled to disability benefits. *Id.* §

2   404.1520(a).

3       **III.**    **Whether the ALJ Erred at Step Four of the Sequential Evaluation Procedure**

4           The ALJ concluded at step four of the sequential process that Plaintiff Elizabeth Cuttitta

5   had the residual functional capacity to perform the full range of work at all exertional levels, with

6   the non-exertional limitation that she can understand, remember and carry out one to two step

7   instructions.  Subject to this limitation, the ALJ found that Plaintiff could perform her past relevant

8   work as a maid or housekeeper.  In reaching his decision, the ALJ accorded great weight to the

9   opinion of the examining psychologist Dr. Goldstein and also gave significant weight to the

10   opinions of the reviewing physicians, in particular Dr. Evans.  He also found that these opinions

11   were consistent with those of Dr. Marian Orr who evaluated Plaintiff on October 16, 2008.  The

12   ALJ gave little weight to the opinion of nurse practitioner Kristy Muir, in part, because there were

13   no treatment notes to substantiate her "global assessment of function findings."  AR 35.

14           "Generally, a treating physician's opinion carries more weight than an examining

15   physician's, and an examining physician's opinion carries more weight than a reviewing

16   physician's." *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001).   If the treating

17   physician's "opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is

18   well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not

19   inconsistent with the other substantial evidence," it should be afforded more weight.  20 CFR

20   416.927(d)(2).  The ALJ need not accept an opinion of a treating physician, however, if it is

21   conclusory and not supported by clinical findings. *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th

22   Cir. 1992).  *See also Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002) ("The ALJ need not

23   accept the opinion of any physician, including a treating physician, if that opinion is brief,

24   conclusory, and inadequately supported by clinical findings.")  If the treating physician's opinion is

25   contradicted by another physician, then the treating physician's opinion can only be rejected by the

26   Secretary for specific and legitimate reasons, supported by substantial evidence in the record for so

27   doing. *Lester v. Charter*, 81 F.3d 821, 831 (9th Cir. 1996).

28   . . .

1       The only medical opinion that supported Plaintiff's testimony regarding the severity of her

2   depression or paranoia was the "Mental Health Physician Questionnaire" form completed by Kristy

3   Muir on September 13, 2010.  That questionnaire, however, was extremely conclusory.  The first

4   question on the form asked Ms. Muir to state the "Frequency and length of contact:"  That question

5   was not answered.  Ms. Muir also provided no detail or explanation for her opinion that Ms.

6   Cuttitta had a global assessment of functioning (GAF) of 42 and that her prognosis was poor.  The

7   ALJ was therefore justified in giving little weight to Ms. Muir's opinion on the grounds that her

8   opinion was not supported by treatment records.[2]

---

[2]"GAF scores 'are used by mental health clinicians and doctors to rate the social, occupational and psychological functioning of adults.'"  *Sweeney v. Commissioner of Social Sec.*, 847 F.Supp.2d 797, 802 (W.D.Pa. 2012), citing *Irizarry v. Barnhart,* 233 Fed.Appx. 189, 190 n. 1 (3d Cir.2007).  "'The GAF scale, designed by the American Psychiatric Association, ranges from 1 to 100, with a score of 1 being the lowest and 100 being the highest.'"  *Id.*, citing *West v. Astrue,* 2010 WL 1659712, at *4 (E.D.Pa. Apr. 26, 2010).  "An individual with a GAF score of 60 may have '[m]oderate symptoms' or 'moderate difficulty in social, occupational, or school functioning;' of 50 may have "[s]erious symptoms (e.g., suicidal ideation ....)' or 'impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job);' of 40 may have '[s]ome impairment in reality testing or communication' or 'major impairment in several areas, such as work or school, family relations, judgment, thinking or mood'. . . ."  *Gallagher v. Astrue,* 2012 WL 2344455, at *10 n. 3 (W.D.Pa. 2012), citing  *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM–IV–TR) 34 (4th ed.2000); *Bracciodieta–Nelson,* 782 F.Supp.2d 152, 157 (W.D.Pa.2011)."

Despite its usefulness as a tool for psychological assessment, courts in the Ninth Circuit hold that a GAF score is not determinative of mental disability or limitation for social security purposes, and an ALJ is not bound to consider it in determining whether a claimant is disabled by a mental impairment.  *Hammons v. Colvin*, 2013 WL 5786092, at *10 (W.D.Wash. 2013), citing *McFarland v. Astrue,* 288 Fed. Appx. 357, 359 (9th Cir.2008) and *Orellana v. Astrue,* 2008 WL 398834, at *9 (E.D.Cal. Feb.12, 2008).  *See also Mann v. Astrue*, 2009 WL 2246350, at *1 (C.D.Cal. 2009) and *Thomas v. Astrue*, 2009 WL 141488, at *6 (C.D.Cal. 2009).  In this case, the ALJ rejected Ms. Muir's GAF score of 42 because it was not substantiated.  Plaintiff's GAF score of 60 in October 2008 and GAF score of 57 in July 2010 are consistent with the ALJ's finding regarding the severity of Plaintiff's mental impairment.

1    The Commissioner also argues that a nurse practitioner is not an "acceptable medical

2    source" under 20 C.F.R. § 404.1513(a).  *Defendant's Cross Motion (#18), pg. 4.*  The ALJ,

3    however, did not cite this regulation in discounting the weight to be given to Ms. Muir's opinion.

4    Plaintiff argues that the ALJ erred in giving greater weight to the opinion of treating

5    physician Dr. Marian Orr than to the opinion of Kristy Muir.  Plaintiff argues that because her

6    depression worsened after she was fired in June 2009, Dr. Orr's opinion regarding her mental

7    condition in October 2008 was irrelevant to her mental condition after June 11, 2009.  This

8    argument would be more persuasive if Ms. Muir had provided an adequate opinion in support of

9    Plaintiff's alleged mental impairment.  The ALJ accorded greater weight to Dr. Orr's opinion than

10   to Ms. Muir's because of Dr. Orr's specialization and opportunity to counsel the claimant on

11   several occasions.  AR 35.  The ALJ, however, gave primary weight to the opinion of Dr. Goldstein

12   who conducted the mental examination and evaluation of Plaintiff on July 29, 2010, and found that

13   "[o]n a sustained basis her overall responses may indicate she is able to understand, remember, and

14   carry out one to two step instructions." AR 217.  The Court finds that the ALJ's reasons for

15   rejecting Ms. Muir's opinions were reasonable and that his reliance on the opinions of Dr.

16   Goldstein, Dr. Evans, and, to some extent, the 2008 opinions of Dr. Orr was also reasonable.

17   Plaintiff also argues that the ALJ erred in "fault[ing] Ms. Cuttita for failing to seek more

18   intense psychiatric therapy."  *Plaintiff's Motion (#16), pg. 11.*  Plaintiff cites the statement in

19   *Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996) that mental impairments are underreported

20   and that a claimant cannot be faulted for seeking treatment for a mental disorder "until late in the

21   day."  *Nguyen* also states that it is questionable practice to chastise a claimant with a mental

22   disorder for the exercise of poor judgment in seeking rehabilitation.  Plaintiff's counsel asserts that

23   Ms. Cuttita tried to get other treatments but she lacked coverage for other modalities.  Id., citing

24   AR 62.  Plaintiff further cites the statement in *Gamble v. Chater*, 68 F.3d 319, 321 (9th Cir. 1995)

25   that "it flies in the face of the patent purposes of the Social Security Act to deny benefits to

26   someone who is too poor to seek treatment."

27   Plaintiff's criticism lacks merit in the context of this case.  Unlike the circumstances in

28   *Nguyen*, the ALJ did not reject the well supported opinion of a treating or examining physician on

15

the basis of the claimant's alleged failure to seek mental health treatment.  The record shows that Ms. Cuttitta received mental health counseling at Harmony Healthcare in October 2008 and her mental condition improved after a relatively brief period of counseling or treatment.  Ms. Cuttitta was thus aware prior to June 2009 of the availability of mental health treatment for her symptoms. Although Plaintiff alleges that her depression and paranoia significantly worsened after she was terminated from her job in June 2009, she failed to present evidence that she sought or obtained significant mental health treatment for her symptoms.  There is, in fact, no evidence that Plaintiff obtained mental health evaluation or treatment until September 2010, after Dr. Goldstein conducted his examination and evaluation of her mental condition.

Plaintiff has also not shown that she was financially unable to obtain mental health treatment.  Ms. Cuttitta testified at the hearing that on one occasion, she sought treatment at a facility called the "Help Center."  She stated that the facility would not accept her, however, "because my insurance is different."  AR 62.  This testimony does not indicate that Plaintiff was generally unable to obtain mental health treatment because of a lack of insurance or financial resources.  The ALJ therefore did not err in considering the absence of more intense mental health treatment in assessing the severity of Plaintiff's mental impairment.

Plaintiff also argues that the ALJ erred by citing the fact that she looked for other work. The ALJ noted that Ms. Cuttitta applied for work after she was terminated by the Palace Station. The fact that a claimant applies for or unsuccessfully attempts to work does not, in itself, support a finding of non-disability.  *See Price v. Commissioner*, 2009 WL 48136, at *9 (D. Idaho 2009).  The ALJ, however, cited Ms. Cuttitta's attempt to find other work as only one factor among others in evaluating the credibility of her testimony regarding the severity of her mental impairment.

Plaintiff argues that the ALJ erred by not following Dr. Goldstein's recommendation to obtain a WAIS-IV (Wechsler Adult Intelligence Scale) and TOMM (Test of Memory and Malingering) to rule out malingering or mental retardation.  In support of this assertion, Plaintiff cites *DeLorme v. Sullivan*, 924 F.2d 841, 849 (9th Cir. 1991) which states that the ALJ has a duty to develop the record and that this duty exists even when the claimant is represented by counsel. *DeLorme* further states that in cases of mental impairment this duty is especially important because

1    mentally ill persons may not be capable of protecting themselves from possible loss of benefits by

2    furnishing necessary evidence.  Plaintiff also cites *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th

3    Cir. 2001) which states that when a claimant is unrepresented, the ALJ must be especially diligent

4    in exploring all relevant facts.  *Chaudhry v. Astrue*, 688 F.3d 661, 669 (9th Cir. 2012) notes,

5    however,  that the ALJ's heightened duty to inquire and develop the record does not apply where

6    claimant is represented by counsel.

7          Plaintiff appointed attorney Charles J. York of the law firm of Shook & Stone Chtd. on

8    September 16, 2010 to represent her on her claim for disability benefits.  AR 102.  Plaintiff's

9    attorney represented her at the hearing before the ALJ on June 9, 2011.  AR 51-63.  Although

10   Plaintiff's counsel was presumably aware of Dr. Goldstein's July 29, 2010 report, he did not make

11   any request during the hearing that the ALJ obtain the WAIS-IV and TOMM tests as recommended

12   by Dr. Goldstein.  Nor has Plaintiff or her counsel shown that she was unable to obtain such testing

13   because of the lack of insurance or financial resources.

14         In addition to Dr. Goldstein's questions regarding possible malingering and the validity of

15   Plaintiff's cognitive tasks performance, the ALJ noted that Plaintiff completed the 11th grade,

16   which he found inconsistent with a finding of general intelligence within the mentally retarded

17   range.  He also noted that Plaintiff never submitted any school records to confirm an IQ in the

18   mentally retarded range.  Plaintiff argues, however, that the ALJ did not question Plaintiff

19   regarding whether she took special education classes in school and there is no evidence to support

20   the ALJ's assumption that Plaintiff's school records would have contained IQ test results.  Plaintiff

21   further argues that absent evidence of sudden trauma that can cause retardation, IQ tests create a

22   rebuttable presumption of a fairly constant IQ throughout the claimant's life.  *See Hodges v.*

23   *Barnhart*, 276 F.3d 1265, 1268 (9th Cir. 2001), citing *Muncy v. Apfel*, 247 F.3d 728, 734 (8th Cir.

24   2001).  Plaintiff, thus, apparently argues that because Plaintiff's cognitive functioning was in the

25   mentally retarded level at the time of Dr. Goldstein's examination, her past cognitive functioning

26   was presumptively also at that level, absent evidence to the contrary.

27         As the ALJ noted, however, Dr. Goldstein found reason to question the validity of

28   Plaintiff's cognitive responses.  It was proper for the ALJ to consider other evidence in the record,

and reasonable inferences therefrom, in determining whether Plaintiff's cognitive functioning was consistent or inconsistent with functioning in the mentally retarded level.  In addition to Plaintiff's educational level, the record also indicated that Plaintiff was able to take care of her personal hygiene, perform household chores, including, with some limitations, cooking, laundering, driving an automobile, taking her children to and from school, and shopping for food, clothing and bargains.  Plaintiff also reported that she was able to pay bills, count change and use a checkbook or money order.  She also reported to Dr. Goldstein that she read books for relaxation.  Based on this record, the Court finds that the ALJ did not err in not referring Plaintiff for the WAIS-IV and TOMM tests before concluding that she was not mentally disabled from performing her past work as a maid or housekeeper.

## CONCLUSION

Based on the foregoing, the Court concludes that the ALJ's determination that Plaintiff's mental impairment does not disable her from performing her past work is supported by substantial evidence in the record and is not contrary to law.  Accordingly,

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that Plaintiff's Motion for Reversal and Remand (#16) be **denied** and that the Acting Commissioner's Cross-Motion to Affirm (#18) be **granted**.

## NOTICE

Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be in writing and filed with the Clerk of the Court within fourteen (14) days.  The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time. *Thomas v. Arn*, 474 U.S. 140, 142 (1985).  This circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order

. . .

. . .

. . .

. . .

and/or appeal factual issues from the order of the District Court. *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

DATED this 5th day of December, 2013.

_____
GEORGE FOLEY, JR.
United States Magistrate Judge